UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| ANTONIO DELGADO-JAIMES, §<br>*Plaintiff* §<br> §<br>v. §<br> §<br>PAMELA BONDI, ATTORNEY §<br>GENERAL OF THE UNITED STATES; §<br>REYNALDO CASTRO, WARDEN, §<br>SOUTH TEXAS ICE PROCESSING §<br>CENTER; SYLVESTER ORTEGA, §<br>FIELD OFFICE DIRECTOR, ICE; TODD §<br>M. LYONS, DIRECTOR, ICE; AND §<br>KRISTI NOEM, SECRETARY, §<br>DEPARTMENT OF HOMELAND §<br>SECURITY; §<br>*Defendant* § | Case No. SA-25-CA-01434-XR |

**ORDER ON PETITION FOR HABEAS CORPUS AND MOTION FOR A
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

On this date, the Court considered the Petitioner's Petition for Habeas Corpus (ECF No. 1) Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 4). After careful consideration, the Petition (ECF No. 1) is **GRANTED**, and the motion for a temporary restraining order and preliminary relief (ECF No. 4) is **DISMISSED AS MOOT**.

**BACKGROUND**

On September 12, 2017, Petitioner Antonio Delgado-Jaimes—a citizen of Mexico who has lived in the United States for approximately twelve years—was granted withholding of removal and relief under the Convention Against Torture ("CAT"). Despite complying with the supervision requirements of release, in July 2025, Petitioner was arrested without notice or explanation during a routine check-in at the ICE San Antonio Field Office. He is currently detained at the South Texas ICE Processing Center in Pearsall, Texas.

I.      **Factual Background**

Petitioner previously entered the United States illegally—and was removed—in April 2013. *See* ECF No. 1 ¶ 9; ECF No. 6-1, Pena Decl. ¶ 5. Approximately six months later, he re-entered the United States and has lived in Texas since. ECF No. 1 ¶ 9.

In March 2017, after being arrested for driving under the influence, Petitioner was taken into Immigration and Customs Enforcement ("ICE") custody for reinstatement of his prior order of removal. ECF No. 6-1, Pena Decl. ¶¶ 6–7. Petitioner underwent a reasonable fear interview in April 2017, in which he described being kidnapped, tortured, and left for dead by a cartel in Mexico. ECF No. 1 ¶ 10. Petitioner was placed in withholding-only proceedings and was granted CAT protection on September 12, 2017. *Id.* ¶ 12. No appeal was taken, and the grant is final. This, Petitioner may not be removed to Mexico, 8 U.S.C. § 1231(b)(3), although he can be removed to a third country willing to accept him. *Johnson v. Guzman Chavez*, 594 U.S. 523, 531–32 (2021).

Petitioner was released under an Order of Supervision on September 15, 2017, and again under a renewed Order of Supervision dated October 17, 2019.[1] ECF No. 1 at 1, 97–99. Implicit in the decision to release Petitioner under supervision was a finding that he was nonviolent and would remain so if released, that he was not likely to threaten the community if released, that he was not likely to violate the conditions of his release, and that he did not pose a flight risk. *See* 8 C.F.R. § 241.4(d)(1) (permitting the release of a noncitizen "if the [noncitizen] demonstrates to the satisfaction of the Attorney General or her designee that his or her release will not pose a danger to the community or to the safety of other persons or to property or a significant risk of flight pending such [noncitizen]'s removal from the United States."); 8 C.F.R. § 241.4(e) (listing

---

[1] The government indicates that the 2019 Order of Supervision was issued after Petitioner was convicted of driving under the influence in January 2018 and was sentenced to 30 days' confinement. ECF No. 6-1, Pena Decl. ¶¶ 12–13. Petitioner states that he "no longer drink[s] alcohol." ECF No. 1 at 94.

the criteria for release as including a determination that the noncitizen "is not likely to pose a threat to the community following release" and "does not pose a significant risk of flight if released"). The Order of Supervision required Petitioner to maintain contact with an assigned ICE official and report in person when requested and complete an application for any travel documents that ICE requested. ECF No. 1 at 97.

Since his release under supervision in September 2017, Petitioner consistently attended required check-ins and complied fully with all reporting obligations. He has worked legally with an employment authorization card, paid taxes, and built a life in Texas with his family, including his parents (both lawful permanent residents), his eight siblings, his wife, and two children (both U.S. citizens). He has not been convicted of any crime since his 2019 Order of Supervision.

At Petitioner's most recent check in, on July 17, 2025, ICE revoked his Order of Supervision and detained him in Pearsall, Texas. ICE has never supplied a reason for the revocation of Petitioner's supervised release and did not even provide Petitioner with notice of his revocation until August 2025, when he had been detained for approximately two months. *See* ECF No. 1 ¶¶ 22–23. The notice he received still did not explain the reason for revocation and merely stated that his case would be reviewed on September 30, 2025, although no such review ever occurred. *Id.* Petitioner asserts that he was not afforded an opportunity to respond to the revocation at an "informal interview" as required under 8 C.F.R. § 241(*l*). *Id.* ¶¶ 21–23

Respondents have allegedly attempted to "browbeat" Petitioner, "threaten[ing] him with lengthy detention in order to try to coerce him to sign [a statement] stating he is no longer in fear of Mexico, which he has refused to do." ECF No. 4 at 5; *see also* ECF No. 1 ¶ 28 (alleging that ICE has "threatened him with removal to random countries" if he does not sign a statement renouncing his fear of Mexico).

## II.     Procedural History

Petitioner filed his petition for a writ of habeas corpus on November 5, 2025, asserting that the government has violated his due process rights (1) by failing to comply with its own regulations governing his revocation of his supervised release and removal to a third country, *Accardi v. Shaughnessy*, 347 U.S. 260 (1954), and (2) by continuing to detain him even though his removal is not reasonably foreseeable. *Zadvydas v. Davis*, 533 U.S. 678 (2001). ECF No. 1. As relief, he asks the Court, among other things, to order his immediate release. On November 12, 2025, Petitioner moved for a temporary restraining order and preliminary injunction, largely restating his arguments for habeas relief. ECF No. 4. Following service of the Petition, the Court held a hearing on November 17, 2025, and directed the government to file a combined response to the Petition and motion by the next day.

In response, the government argues that the Court lacks jurisdiction over Petitioner's claims and that Petitioner's detention comports with the requirements of due process and applicable regulations. ECF No. 6. In support of its response, the government proffers the declaration of a Celestina Pena, a Supervisory Detention and Deportation Officer for ICE in the San Antonio, Texas Field Office of Enforcement and Removal Operations ("ERO"). ECF No. 6-1, Pena Decl. In her declaration, Pena sets out Petitioner's criminal history and the history of his removal proceedings based on her review of electronic records, the A-file, and information from "other [Department of Homeland Security ("DHS")] employees" and "employees of DHS contract facilities." *Id.* ¶ 4.

While Pena asserts that Petitioner was served with a "Notice of Revocation of Release," ECF No. 6-1, Pena Decl. ¶ 14, her declaration does not include a copy of the notice or any key details about the notice (e.g., when Petitioner was served with the notice, the reason for the

revocation of release, or any facts showing regulatory compliance). Similarly, while Pena insists that "an informal interview was conducted," *id.*, she does not identify the date or time of the purported interview, let alone documentation showing that it occurred.

In her declaration, Pena also outlined the efforts Respondents have allegedly undertaken thus far to secure Petitioner's removal to a third country. She asserts that "on August 18, 2025, ERO submitted 'Requests for Acceptance' to the countries of Guatemala, Canada, and Panama." *See* ECF No. 6-1, Pena Decl. ¶ 15. In October 2025, El Salvador and Belize apparently declined to accept Petitioner, although it is not clear when the government submitted its requests to those countries. *See id.* ¶¶ 16, 17. The declaration does not state that ICE has ever requested that Petitioner apply for travel documents to any of the countries ICE contacted.

In reply, Petitioner challenges Pena's declaration as hearsay and otherwise insufficient to establish that the government has complied with its own regulations or that Petitioner's removal to a third country is reasonably foreseeable. ECF No. 9.

## LEGAL STANDARD

A habeas petitioner must show they are "in custody in violation of the Constitution or laws or treaties of the United States." *Villanueva v. Tate*, No. CV H-25-3364, 2025 WL 2774610, at *4 (S.D. Tex. Sept. 26, 2025) (quoting 28 U.S.C. § 2241(c)(3)). The petitioner "bears the burden of proving that he is being held contrary to law; and because the habeas proceeding is civil in nature, the petitioner must satisfy his burden of proof by a preponderance of the evidence." *Id.* (quoting *Skaftouros v. United States*, 667 F.3d 144, 158 (2d Cir. 2011); also citing *Bruce v. Estelle*, 536 F.2d 1051, 1058 (5th Cir. 1976)). "A court considering a habeas petition must 'determine the facts, and dispose of the matter as law and justice require.'" *Id.* (quoting 28 U.S.C. § 2243).

I.      **The Court has Jurisdiction over the Petition**

The government contends this Court lacks jurisdiction over Petitioner's due process claims because they are "inextricably intertwined with ICE's unreviewable authority to execute a final order of removal." ECF No. 6 at 6. But Petitioner does not challenge his removal or the government's ability to detain him in the time necessary to effect his removal. Rather, he challenges the government's authority to hold him in detention *indefinitely* while it tries to find a third country that will accept him. These types of claims are not barred by 8 U.S.C. § 1252(g). *See Demore v. Kim*, 538 U.S. 510, 516–17 (2003) (citing 28 U.S.C. § 2241(c)(3)); *Baez v. Bureau of Immigr. & Customs Enf't*, 150 F. App'x 311, 312 (5th Cir. 2005) (per curiam) (courts retain the power to hear statutory and constitutional challenges to immigration detention when those claims do not challenge the final order of removal).

Similarly, the Court recognizes that it has no jurisdiction to review a "decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security." 8 U.S.C. § 1252(a)(2)(B)(ii); *see also* 8 C.F.R. § 241.4. (permitting ICE officials to decide to revoke supervised release "in the exercise of discretion").

But Petitioner does not challenge the purported decision to revoke his Order of Supervision.[2] Instead, he challenges the manner in which the government has re-detained him, which he contends was done without due process and in violation of ICE's own regulations. "Nothing in 8 U.S.C. § 1252(a)(2)(B)(ii) prevents the Court from considering [Petitioner]'s challenge to the manner in which the government revoked his Order of Supervision or considering

---

[2] The Court refers to this as a "purported" revocation because the government has not provided a copy of an order revoking supervision to either Petitioner or the Court. Absent this, nothing before the Court demonstrates that such an order exists.

6

whether the government followed its own regulations in doing so." *Villanueva*, 2025 WL 2774610, at *5 (citing, *inter alia*, *Zadvydas*, 533 U.S. at 687–88 (holding that a § 2241 petition is the proper vehicle for a petitioner to use to challenge the legality and constitutionality of post-removal-period detention)); *see also Oyelude v. Chertoff*, 125 F. App'x 543, 546 (5th Cir. 2005) (courts have jurisdiction to review detention "insofar as that detention presents constitutional issues, such as those raised in a habeas petition").

In short, the Court has jurisdiction to review Petitioner's claims that his detention violates his statutory and constitutional rights to due process.

## II.  Petitioner's Detention Violates His Due Process Rights

Petitioner argues that he is entitled to relief for two reasons: First, he argues the government has violated its own regulations governing his revocation of release and removal to a third country, in violation of procedural due process. *See Accardi v. Shaughnessy*, 347 U.S. 260 (1954). Second, he argues his detention violates 8 U.S.C. § 1231(a)(6) and is illegal under *Zadvydas v. Davis*, 533 U.S. 678 (2001), because his removal is not reasonably foreseeable. The Court will address each point in turn.

### A.  Petitioner Was Detained in Violation of Mandatory Government Procedures

On July 17, 2025, ICE detained Petitioner at a scheduled office visit—without written notice of revocation, without the mandatory informal interview, and without any individualized finding or signature by an official with delegated revocation authority—and has provided no country-specific reasonable-fear process for any third-country removal. Petitioner asserts that, in doing so, the government has violated its own mandatory procedural requirements in violation of his Fifth Amendment due process rights. *See* ECF No. 1 ¶¶ 21–23, 28; ECF No. 9 at 8–13; ECF No. 4 at 3, 5–8 (citing 8 C.F.R. §§ 241.4(*l*)(1)–(2), 241.13, 208.31, 1208.31(g), and 1241.8(e)).

The statutes and regulations governing immigration and removal proceedings afford important procedural safeguards to detainees. *See United States v. Caceres*, 440 U.S. 741, 760 (1979). For Petitioner's detention to be constitutional, the government must have complied with both the applicable statutory provisions and its own regulations. *Id.* (when federal regulations afford individual rights and protections, the Supreme Court has insisted on requiring an agency's compliance with its own regulations).

"Under deeply rooted principles of administrative law, not to mention common sense, government agencies are generally required to follow their own regulations." *Villanueva*, 2025 WL 2774610, at *7 (quoting *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 130 (2d Cir. 2020); *see also Gulf States Mfrs., Inc. v. Nat'l Lab. Relations Bd.*, 579 F.2d 1298, 1308 (5th Cir. 1978) ("It is well settled that an Executive Agency of the Government is bound by its own regulations, which have the force and effect of law, and the failure of an agency to follow its regulations renders its decision invalid."); *Gov't of Canal Zone v. Brooks*, 427 F.2d 346, 347 (5th Cir. 1970) (per curiam) ("It is equally well established that it is a denial of due process for any government agency to fail to follow its own regulations providing for procedural safeguards to persons involved in adjudicative processes before it."). "Multiple courts have held that the government's failure to follow its own immigration regulations may warrant the release of a detained noncitizen." *Villanueva*, 2025 WL 2774610, at *7 (collecting cases); *see also id.* ("The government's position that it can choose, based on a change in administration, not to comply with its own regulations is unprecedented.").

Petitioner alleges violations of the statutes and regulations governing (1) the purported revocation of his Order of Supervision and (2) his right to challenge the revocation.

### 1. Revocation of Release

Once Petitioner was released from detention under an Order of Supervision, the revocation of that release was subject to the provisions of 8 C.F.R. § 241.4(*l*)(2). That subsection limits the exercise of the discretion to revoke an Order of Supervision:

> Release may be revoked in the exercise of discretion when, in the opinion of the revoking official:
>
> (i)  The purposes of release have been served;
>
> (ii) The [noncitizen] violates any condition of release;
>
> (iii) It is appropriate to enforce a removal order or to commence removal proceedings against a[noncitizen]; or
>
> (iv) The conduct of the [noncitizen], or any other circumstance, indicates that release would no longer be appropriate.

8 C.F.R. § 241.4(*l*)(2).

Moreover, only certain government officials explicitly identified in the federal regulations have the authority to revoke an Order of Supervision:

> The Executive Associate [Director] shall have authority, in the exercise of discretion, to revoke release and return to [ICE] custody a [noncitizen] previously approved for release under the procedures in this section. A district director may also revoke release of a [noncitizen] when, in the district director's opinion, revocation is in the public interest and circumstances do not reasonably permit referral of the case to the Executive Associate [Director].

8 C.F.R. § 241.4(*1*)(2).

Petitioner asserts that the Government has offered no explanation for revoking his Order of Supervision. Indeed, Pena's declaration contains no facts concerning whether Petitioner's Order of Supervision has ever been revoked, much less whether it has been legally revoked for a permissible reason by an order signed by anyone with the requisite authority to revoke his supervised release. *See generally* ECF No. 6-1, Pena Decl. Instead, it states only that Petitioner

9

was "was arrested and taken into custody on July 17, 2025, and is now detained at the South Texas Processing Center." *Id.* ¶ 14.

In the absence of some evidence that Petitioner's Order of Supervision was lawfully revoked by someone with the authority to do so and for a reason lawfully permitted, the Government has failed to show that it afforded Petitioner with due process in connection with the purported revocation of his Order of Supervision. The record before the Court shows that Petitioner was arrested and re-detained in violation the statutes and regulations that govern the revocation of a lawful Order of Supervision.

### 2. Right to Challenge Revocation of Release

Petitioner also contends that the government violated his due process rights by violating the requirements of 8 C.F.R. § 241.4(*l*)(1). That section provides:

> Any [noncitizen] . . . who has been released under an order of supervision or other conditions of release who violates the conditions of release may be returned to custody . . . . *Upon revocation, the [noncitizen] will be notified of the reasons for revocation of his or her release or parole. The [noncitizen] will be afforded an initial informal interview promptly after his or her return to Service custody to afford the [noncitizen] an opportunity to respond to the reasons for revocation stated in the notification.*

8 C.F.R. § 241.4(*l*)(1) (emphasis added).

Petitioner asserts that he has never been provided with a notification of the revocation of his Order of Supervision, has never been advised of the reasons for the purported revocation, and has never been provided with the informal interview required by § 241.4(*l*)(1). Pena insists that "[a]n informal interview was conducted." ECF No. 6-1, Pena Decl. ¶ 14. Because Petitioner has never been informed of the reason for the purported revocation, any "interview" allegedly conducted was necessarily deficient under § 241.4(*l*)(1). As a matter of logic, Petitioner could not have "respond[ed] to the reasons for revocation" at such an interview if he was never informed of

10

the reasons in the first place. (And, again, the government's failure to identify the reason for the revocation in even a cursory manner for the Court is good circumstantial evidence that ICE has not explained the revocation to Petitioner.)

The government does not address Petitioner's claim that his detention violated his due process rights by failing to comply with its own regulations, much less proffer any evidence demonstrating its compliance. *See generally* ECF No. 6. Instead, it seeks to rely on the adequacy of the process afforded to Petitioner during his withholding-only proceedings. *Id.* Needless to say, the government's compliance with different procedural requirements over eight years ago has no bearing on whether the government complied with regulations governing his detention in 2025.

### B.     Petitioner's Removal is Not Reasonably Foreseeable.

"[T]he Government ordinarily secures [a noncitizen]'s removal during" the ninety days following a final order for the person to be removed. *Zadvydas*, 533 U.S. at 682; 8 U.S.C. § 1231(a)(1). During that ninety-day "removal period," the person subject to removal is typically detained. *Zadvydas*, 533 U.S. at 682. Beyond that point, the Government may in some situations continue detaining them for as long as is "reasonably necessary" to secure their removal. *Id.*; 8 U.S.C. § 1231(a)(6). But, under *Zadvydas*, "once removal is no longer reasonably foreseeable, continued detention is no longer authorized." 533 U.S. at 699.

*Zadvydas* recognized a "presumptively"—not categorically—reasonable period of detention. 533 U.S. at 699 (emphasis added); *Villanueva*, 2025 WL 2774610, at *10 ("[T]he presumption of constitutionality during that six-month period is rebuttable."); *Zavvar v. Scott*, No. CV 25-2104-TDC, 2025 WL 2592543, at *5–6 (D. Md. Sept. 8, 2025) (collecting cases). It did so merely to "guide" lower court determinations of whether removal is reasonably foreseeable. *Munoz-Saucedo v. Pittman*, No. CV 25-2258 (CPO), 2025 WL 1750346, at *6 (D.N.J. June 24,

11

2025) (quoting *Zadvydas*, 533 at 700–01).[3] *Zadvydas* unequivocally held that "once removal is no longer reasonably foreseeable, continued detention is no longer authorized." 533 U.S. at 699–700.

A detained person who brings a *Zadvydas* claim *before* the presumptively reasonable six-month period must *prove* "that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.*; *Medina*, 2025 WL 2306274, at *6 (quoting *Munoz-Saucedo*, 2025 WL 1750346, at *6). To make out a *Zadvydas* claim *after* the six months have run, a detained noncitizen need only "provide[] good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.* at 701. If he does so, "the Government must respond with evidence sufficient to rebut that showing." It is unclear, however, whether *Zadvydas*'s six-month period begins immediately when the removal period ends or when the challenging party is physically detained.[4] *See Villanueva*, 2025 WL 2774610, at *9 (noting that starting the clock at physical detention would encourage the government to avoid *Zadvydas* by "simply releasing and

---

[3] "Some courts have held that until the six-month *Zadvydas* period concludes, detention is *conclusively* reasonable—in other words, that during that period courts are precluded from inquiring at all into whether removal is reasonably foreseeable." *Medina v. Noem*, No. 25-CV-1768-ABA, 2025 WL 2306274, at *5 (D. Md. Aug. 11, 2025) (collecting cases); *see also Chance v. Napolitano*, 453 F. App'x 535, 2011 WL 6260210 (5th Cir. 2011) (non-precedential opinion affirming a district court's finding that a challenge to post-removal detention was premature where *Zadvydas*'s six-month period had not passed); *Agyei-Kodie v. Holder*, 418 F. App'x 317, 2011 WL 891071, at *1 (5th Cir. Mar. 15, 2011) (same). But, again, *Zadvydas*'s creation of a *presumption* and the case's actual rule—"if removal is not reasonably foreseeable, the court should hold continued detention unreasonable and no longer authorized by statute"—command against that understanding. *Zadvydas*, 533 U.S. at 699–700.

[4] *Zadvydas* is not clear on this point. The petitioners there were not released after their removal period. 533 U.S. at 684–86. And *Zadvydas* spoke of "continued" detention, which could refer to detention "continu[ing]" without release from the removal period. *E.g.*, *id.* at 699 ("[O]nce removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute."). Those factors might suggest the presumptively reasonable six-month period starts immediately after the removal period ends, no matter when a noncitizen is physically detained. *Zavvar*, 2025 WL 2592543, at *4 ("[T]here is, at a minimum, a reasonable argument that the six-month period runs continuously from the beginning of the removal period, even if the noncitizen is not detained throughout that period.") (collecting cases).

On the other hand, *Zadvydas* was, at base, about ensuring people are not *confined* for an unreasonable period of time. *See* 533 U.S. at 682, 699–700. It speaks in terms of post-removal *confinement* in contrast with "releas[ing]" someone "under supervision." *Compare id.* at 701 ("[A]s the period of prior postremoval *confinement* grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink.") (emphasis added), *with id.* at 683 ("[T]he Government 'may' . . . release [an] alien under supervision."). Further, because detention's basic purpose in this context is to ensure one's presence at the time of removal, limiting the presumption of reasonableness to the six months immediately following the removal period might undermine "necessary Executive leeway" to determine when to begin the removal process. *See id.* at 700–701.

12

then re-detaining a noncitizen," and that such gamesmanship has no basis in either the statutes, the regulations, or *Zadvydas* itself").

Although Petitioner has been physically detained for less than six months, the parties appear to agree that the "good cause" standard applies. *See* ECF No. 1 at 7; ECF No. 6 at 3–5. Because the Court concludes that Petitioner has proven that there is no significant likelihood of his removal in the reasonably foreseeable future, he has met his burden under either standard.

### 1. Procedural Framework for Removal to a Third Country

To assess the foreseeability of Petitioners' removal to a third country, it is worth considering the procedural requirements governing a noncitizen's removal to a third country.

Removal proceedings determine not only whether a noncitizen may be removed from the United States but also to where he may be removed. In determining the location of removal, the law entitles the noncitizen to first voluntarily select a country of removal. *See* 8 U.S.C. § 1231(b)(2)(A)(i); 8 C.F.R. § 1240.10(f). If the noncitizen does not do so, the immigration judge will designate the country of removal and may also designate alternate countries to which the noncitizen may be removed. *See* 8 C.F.R. § 1240.10(f).

In addition, the immigration judge may designate a country or countries to which the noncitizen may *not* be removed if the noncitizen proves to the court's satisfaction that the noncitizen is likely to be tortured or persecuted if removed to that country. *See* 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. § 1208.16(b). In that circumstance, the government may remove the noncitizen to any third "country whose government will accept the [noncitizen] into that country." 8 U.S.C. § 1231(b)(2)(E)(vii). Still, the noncitizen may not be removed to any country in which there is reason to believe that he would be tortured or persecuted. *See* 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. §§ 208.16–.18; 8 C.F.R. §§ 1208.16–.18.

Thus, when the Government intends to remove a noncitizen to a third county, it must provide notice of the intended removal that is sufficient to enable the noncitizen to challenge that removal either as violating an order of withholding or as removing him to a country that will subject him to torture or persecution. *See, e.g.*, *Noem v. Abrego Garcia*, ––– U.S. –––, 145 S.Ct. 1017, 1019–20 (2025) (Sotomayor, J., concurring); *Andriasian v. Immigr. & Naturalization Serv.*, 180 F.3d 1033, 1041 (9th Cir. 1999). The "notice must be afforded within a reasonable time and in such a manner as will allow [the noncitizen] to actually seek . . . relief in the proper venue before removal occurs." *J.G.G.*, 604 U.S. at 673.

### 2.     Foreseeability of Removal to a Third Country

The government observes that the "reasonably foreseeable future" standard is "fluid and country-specific, depending in large part on country conditions and diplomatic relations." ECF No. 6 at 4. But that statement essentially proves Petitioner's point—how could a Court possibly find that a detainee is likely to be removed in the "reasonably foreseeable future" based on "country conditions and diplomatic relations" if the government has not identified the country to which the detainee will be removed?

To be sure, courts have held that "[a] 'lack of visible progress' in the removal process 'does not in and of itself meet [a petitioner's] burden of showing that there is no significant likelihood of removal.'" *Ali v. Johnson*, No. 3:21-CV-00050-M (BT), 2021 WL 4897659, at *2 (N.D. Tex. Sept. 24, 2021), *adopted*, 2021 WL 4893605 (N.D. Tex. Oct. 20, 2021) (citing *Fahim v. Ashcroft*, 227 F. Supp. 2d 1359 (N.D. Ga. 2002)). But it was possible to write off delays in those cases as "the bureaucratic gears of the INS . . . slowly grinding away," because they involved *repatriation*. *See Fahim*, 227 F. Supp. 2d at 1366; *see also Ali*, 2021 WL 4897659, at *2. In other words, it was possible to see what the government was grinding *toward*. *See Fahim*, 227 F. Supp. 2d at 1366

("[T]he mere fact that the Egyptian government has taken its time in responding to the INS request for travel documents does not mean that it will not do so in the future."); *see also Ali*, 2021 WL 4897659, at *3 ("ERO has been actively engaged in the removal process here and followed up with Indian officials to obtain Ali's travel documents."). Because Petitioner cannot be removed to his country of origin and the government has not identified a country willing to accept him, this case stands on completely different ground.

To begin, there is no evidence that the government attempted to remove Petitioner during the *eight years* between his order of removal and his detention in 2025 or that they have found a country to take him—the very first step in the process of removing a noncitizen to a third country. ICE has provided no evidence that any country has agreed to accept Petitioner, nor has it asked for Petitioner's assistance in obtaining travel documents. Even if ICE had identified a country willing to accept Petitioner, he would have a right to a reasonable fear screening. 8 C.F.R. § 1208.31.

Moreover, ICE's alleged attempts to force Petitioner to give up his withholding of removal and CAT relief strongly suggest the government has no reason to believe it will be able to remove him to a third country. ECF No. 1 ¶ 28; *see* ECF No. 6 (failing to deny these allegations).[5] In other words, if the government believed that a third country would accept him, it would have no reason to insist upon his removal to Mexico.

In the same vein, ICE did not provide Petitioner with any justification for his detention and still, four months later, has not offered one to the Court. ICE's inability to muster even a cursory explanation for its conduct so far suggests either (1) that the detention was intended to coerce

---

[5] ICE cannot lawfully remove Petitioner to Mexico without first formally terminating his withholding of removal protection through proceedings before an Immigration Judge. ICE has not initiated any such proceedings and has not suggested that it intends to do so.

15

Delgado-Jaimes to consent to being removed to Mexico or (2) profound organizational deficiencies. In either case, Petitioner's removal is not reasonably likely in the foreseeable future.

Taken together, the long period of time between Petitioner's removal order and his detention, the lack of any explanation for his detention in 2025, and ICE's attempts to convince Petitioner to consent to removal to a country where he cannot legally be removed, show that Petitioner's removal is not reasonably foreseeable. *See Villanueva*, 2025 WL 2774610, at *10 (granting petition for writ of habeas corpus based on *Zadvydas* where detainee had withholding of removal, the government had not initiated proceedings to lift the order to withhold removal, the government had failed to remove him for eight years following his order of removal, and there was no evidence that circumstances had changed to make removal reasonably foreseeable).

"The Court is mindful that the government has the right to enforce [Petitioners]'s Order of Removal. But the government may not detain [Petitioner] for an indefinite and undetermined period of time while it tries to effect that removal when the circumstances are such that his removal is not reasonably likely in the foreseeable future. Such an action violates the Due Process Clause, as explained in *Zadvydas*." *Id.* Thus, Petitioner must be released. *Zadvydas*, 533 U.S. at 699.

### III.    Scope of Relief

Having determined Delgado-Jaimes's petition is well taken, the Court considers the scope of appropriate relief based on the three factors set out by the Supreme Court in *Mathews v. Eldridge*:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. 319, 334–35.

Here, even if the government has the discretion to revoke Petitioner's supervision, his constitutionally protected liberty interests are implicated by his re-detention. The Supreme Court has stated that "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690. Moreover, individuals who have been conditionally released from detention have a protected interest in their "continued liberty." *Young v. Harper*, 520 U.S. 143, 147 (1997). This is true even when the released individual is subject to extensive conditions of release. *Id.* at 148; *see also Morrissey v. Brewer*, 408 U.S. 471, 482 (1972).

Petitioner has a liberty interest in his continued release under his Order of Supervision. He has been free under that Order for over eight years. He has a job and a family, including a newborn daughter born while he was in detention, whom he has never met. He has complied with all of the terms of his Order of Supervision. "There is no principled reason to find that [Petitioner] does not have an overwhelming liberty interest in his continued release that may not be removed without due process." *Villanueva*, 2025 WL 2774610, at *11.

Second, "the risk of an erroneous deprivation of [Petitioner]'s rights is high. The regulations enacted by the government itself are intended to ensure that noncitizens who have been released to supervision do not arbitrarily have that supervision revoked." *Id.* By failing to follow its own regulations, the government has denied Petitioner notice of its intent to revoke his supervision, notice of the reasons for the revocation, and an opportunity to challenge those reasons. The government offers no explanation for its failure to comply with its own regulations. *Cf. id.* (noting that changes in enforcement priorities cannot be made "at the expense of individuals' due process rights."). The risk of an arbitrary and erroneous deprivation under these circumstances is undeniably significant.

Third, the burden imposed on the government does not outweigh Petitioner's interests. "To be sure, the government has a weighty interest in removing deportable noncitizens, ensuring compliance with Orders of Supervision, and protecting the public. But in this case, those interests will not be impaired by requiring the government to comply with its own regulations in determining whether to revoke [Petitioner's] supervision and whether to re-detain him." *Id.* Again, the government can have no legitimate interest in ignoring its own regulations, which are intended to ensure that the discretion afforded to the government's agents is not exercised arbitrarily.

Pena does not attest in her declaration that Petitioner failed to comply with his Order of Supervision or that his removal is imminent. *See* ECF No. 6-1. Further, the government identifies no factual basis to believe that Petitioner poses a danger to the public. While the government recounts Petitioner's criminal history, both events predated the government's subsequent decisions to release Petitioner on supervision, and the government "does not identify any changed circumstances that would appear to warrant the revocation of [Petitioner]'s supervision and his re-detention without even the barest hint of due process." *Villanueva*, 2025 WL 2774610, at *11.

Having considered Delgado-Jaimes's petition and its attachments, the government's response and attachments, and the law, the Court finds that the balance of the factors establishes that the government violated Petitioner's due process rights by re-detaining him without complying with its own regulations and the law. The Court also finds that Petitioner's continued detention violates due process because it is not reasonably likely that he will be removed in the foreseeable future. The only way to vindicate Petitioner's due process rights is to order his release from custody. The Court therefore grants Petitioner's petition and orders his release subject to the conditions set forth below.

Petitioner requests attorney's fees under the Equal Access to Justice Act ("EAJA"). 28 U.S.C. § 2412(d)(1)(A). Because fees under the EAJA are not available in habeas corpus proceedings like this one, that request is denied. *Barco v. Witte*, 65 F.4th 782. (5th Cir. 2023).

## CONCLUSION

For the foregoing reasons, the Petition for Habeas Corpus (ECF No. 1) is **GRANTED**. It is **ORDERED** that:

1. Respondents shall **RELEASE** Petitioner Antonio Delgado-Jaimes from custody, under appropriate conditions of release, to a public place by **no later than 12:00 p.m.** on **November 28, 2025;**

2. Respondents shall **NOTIFY** Petitioner's counsel of the exact location and exact time of Petitioner's release as soon as practicable and **no less than two hours before his release;**

3. The parties shall **FILE** a Joint Status Report **no later than 5:00 p.m.** on **November 28, 2025**, confirming that Petitioner has been released;

4. Once Respondents identify a country that is willing to accept Delgado-Jaimes, they must **NOTIFY** him and his counsel of the country to which it intends to remove Delgado-Jaimes with sufficient time for him to object, if necessary; and

5. Petitioner's Motion for a Temporary Restraining Order and Preliminary Injunction (ECF No. 4) is **DENIED AS MOOT**.

The Clerk is **DIRECTED** to **CLOSE** this case. A final judgment will issue separately.

It is so **ORDERED**.

**SIGNED** this 26th day of November, 2025.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE